**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| THE HUNTINGTON NATIONAL BANK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) Case No. |
| | ) |
| | ) |
| v. | ) |
| | ) |
| KADEN'S COMMONS, LLC AND JEREMY | ) |
| WOLFF, | ) |
| | ) |
| Defendants. | ) |

## VERIFIED COMPLAINT

NOW COMES Plaintiff The Huntington National Bank, by and through its attorneys, Dickinson Wright PLLC, and for its Verified Complaint against Defendants, Kaden's Commons, LLC and Jeremy Wolff, states as follows:

## THE PARTIES

1.      Plaintiff The Huntington National Bank (the "Bank"), is a national bank organized and existing under the laws of the United States of America with a principal place of business in Columbus, Ohio, and which maintains its main office in Ohio, as set forth in its certificate submitted to the Office of the Comptroller of the Currency of the U.S. Treasury (the "OCC").

2.      Defendant Kaden's Commons, LLC ("Borrower"), is an Illinois limited liability company in good standing, with its principal place of business at 3501 W. Belmont Avenue, #63, Chicago, IL 60618.

3.      Borrower's sole member is Jeremy Wolff ("Guarantor").  Guarantor is an Illinois resident in that, upon information and belief, he maintains his domicile and principal place of

residence at 3141 W. Grace Street #3, Chicago, IL 60618.  Therefore, Borrower is a citizen of the State of Illinois.

4.      Guarantor is an individual who is a citizen of the State of Illinois because, upon information and belief, he maintains his domicile and principal place of residence at 3141 W. Grace Street #3, Chicago, IL 60618.

## JURISDICTION AND VENUE

5.      Jurisdiction is proper under 28 U.S.C. § 1332(a)(1) as the amount in controversy exceeds $75,000.00 exclusive of interest and costs, and is between citizens of different states.

6.      Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because one or more of the Defendants reside in the Northern District of Illinois, Eastern Division, and the loan and personal property subject to this action was entered into, accepted, and situated in the Northern District of Illinois, Eastern Division.

## COMMON ALLEGATIONS

7.      The Bank made a loan (the "Loan") to Borrower evidenced by that certain U.S. Small Business Administration Note from Borrower to the Bank dated January 30, 2023, in the original principal amount of $504,400.00 (the "Original Note").  A copy of the Original Note is attached hereto as **Exhibit A**.

8.      The Original Note was amended by that certain Promissory Note Modification Agreement dated August 18, 2023 ("Modification Agreement 1") and by that certain Promissory Note Modification Agreement dated January 11, 2024 ("Modification Agreement 2", and together with Modification Agreement 1 are collectively referred to as the "Note Modifications", and together with the Original Note are collectively referred to as the "Note").  A copy of the Note Modifications are attached hereto as **Group Exhibit B**.

9.      On January 30, 2023, Guarantor made, signed, and delivered to the Bank a certain U.S. Small Business Administration Unconditional Guarantee (the "Guaranty") in writing, whereby he promised and agreed promptly to pay any and all indebtedness of Borrower to the Bank then existing or due or to be incurred or become due under the Note. A copy of the Guaranty is attached hereto as **Exhibit C**.

10.      Borrower is in default under the Note for its failure to make all required payments under the Note commencing on June 5, 2024 and continuing thereafter.  Pursuant to the terms contained therein, the entire principal balance plus accrued interest and late charges has been accelerated and is immediately due and owing.  A default under the Note is a default under the Guaranty.

11.      As of October 3, 2024, there is due and owing on the Note:

| | |
|---|---|
| Principal | $ 590,997.80 |
| Accrued Interest | $  32,954.20 |
| Appraisal Fees | $   1,650.00 |
| Paid Legal Fees | $   1,380.00 |
| Return Check Charge | $      60.00 |
| Late Charges | $   1,547.30 |
| **Total:** | **$ 628,589.30** |

12.      From and after October 3, 2024, interest accrues on the unpaid principal balance under the terms of the Note at the rate of $174.06 per day.  In addition, the Bank has incurred and will continue to incur attorneys, appraisal, inspection, search, credit report and other fees and expenses as needed until the date of sale, all of which are compensable under the terms of the Note and the Guaranty.

## COUNT I – BREACH OF THE NOTE
### (Against Borrower)

13.    The Bank restates and re-alleges paragraphs 1-12, inclusive, as though fully set forth in this paragraph 13.

14.    The Bank has performed any and all conditions precedent on its part under the Note.

15.    The Bank has demanded payment from Borrower, but Borrower has failed to make payment as required by the Note.

16.    Under the terms of the Note, Borrower is indebted to the Bank for all amounts now due and owing, together with further accruing interest, and all sums incurred by the Bank in the collection of such amounts due, including attorneys' fees and court costs.

## REQUEST FOR RELIEF AS TO COUNT I

Wherefore, Plaintiff The Huntington National Bank, requests that the Court enter the following:

(1) A judgment in its favor and against Defendant Kaden's Commons, LLC in the amount of at least $628,589.30 as of October 3, 2024, together with further accruing interest, costs, charges, fees and attorneys' fees; and

(2) Such other and further relief as the Court may deem just and equitable.

## COUNT II – BREACH OF UNCONDITIONAL GUARANTEE
### (Against Guarantor)

17.    The Bank restates and re-alleges paragraphs 1-12, inclusive, as though fully set forth in this paragraph 17.

18.    The Guaranty was absolute, unconditional and continuing, including all costs and expenses of the Bank in enforcing the Guaranty.

19.     Pursuant to and in reliance upon the Guaranty, the Bank advanced and loaned to Borrower the amount set forth in the Note.

20.     The Bank has fulfilled all conditions of the Guaranty on its part to be performed.

21.     The Bank has duly advised and informed Guarantor that the Note is past due and delinquent and has not been paid in full.

22.     The Bank has made due demand for payment upon Guarantor, and to date, Guarantor has failed to make payment thereof.

23.     The Bank has incurred and continues to incur attorneys' fees to collect the balance due under the Note and the Guaranty.

24.     Guarantor is not entitled to any credits or setoffs.

25.     Accordingly, Guarantor is indebted to the Bank as of October 3, 2024 in the amount of at least $628,589.30, together with further accruing interest, costs, charges and fees, and all sums incurred by the Bank in the collection of such amounts due, including attorneys' fees and court costs.

## **REQUEST FOR RELIEF AS TO COUNT II**

Wherefore, Plaintiff The Huntington National Bank, requests that the Court enter the following:

(1)     A judgment in its favor and against Jeremy Wolff in the amount of at least $628,589.30 as of October 3, 2024, together with further accruing interest, costs, charges, fees and attorneys' fees; and

(2)     Such other and further relief as the Court may deem just and equitable.

## COUNT III – REPLEVIN
### (Against Borrower)

26.     The Bank restates and re-alleges paragraphs 1-12, inclusive, as though fully set forth in this paragraph 26.

27.     On or about January 30, 2023, in connection with the Loan and to further secure Borrower's repayment obligations, Borrower executed and delivered to the Bank a certain Commercial Security Agreement (the "CSA"). A copy of the CSA is attached hereto as **Exhibit D**.

28.     The CSA provides that the Bank has a perfected security interest in, *inter alia*, all of Borrower's inventory, equipment, accounts, chattel paper, instruments, general intangibles, money, and fixtures, which includes the property set forth in the attached **Exhibit E** (collectively, the "Personal Property").

29.     The Bank's security interest in the Personal Property conveyed by the CSA was also perfected by the filing of that certain UCC Financing Statement naming Borrower as Debtor, filed on February 3, 2023, with the Illinois Secretary of State, in favor of the Bank (the "Financing Statement"). A copy of the Financing Statement is attached hereto as **Exhibit F**.

30.     The Personal Property consists of HVAC equipment, furniture, play structures, children's toys, office equipment, and related products.

31.     Borrower wrongfully detains and withholds the Personal Property from the Bank.

32.     The net forced liquidation value of the Personal Property is $22,615.00.

33.     The Bank claims the value of Personal Property not delivered to the officer under the order for replevin entered by this Court.

## REQUEST FOR RELIEF AS TO COUNT III

Wherefore, Plaintiff The Huntington National Bank, requests that the Court enter an order as follows:

(1)     An Order of Replevin issue and for judgment against Defendant, Kaden's Commons, LLC, for possession of the Personal Property, the value of the Personal Property not delivered, and damages for the detention thereof;

(2)     Providing such other and further relief as the Court may deem just and equitable.

Respectfully Submitted,

**THE HUNTINGTON NATIONAL BANK**

By: /s/ Andrew H. Eres

Andrew H. Eres (ILARDC 6237032)
Jeremy P. Kreger (ILARDC 6280403)
Briana Y. Hammons (ILARDC 6349199)
Ronald A. Damashek (IARDC 6183820)
Dickinson Wright PLLC
55 West Monroe, Suite 1200
Chicago, Illinois 60603
(312) 641-0060
aeres@dickinson-wright.com
jkreger@dickinson-wright.com
bhammons@dickinson-wright.com
rdamashek@dickinson-wright.com

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THE HUNTINGTON NATIONAL BANK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Case No. |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KADEN'S COMMONS, LLC AND JEREMY WOLFF, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## VERIFICATION

Under penalties as provided by law pursuant to §1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief, and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

By: _____

Robb Straubel, Vice President
The Huntington National Bank

Subscribed and sworn to before me
this 29 day of October, 2024.

_____
Notary Public

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE HUNTINGTON NATIONAL BANK, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| | ) | Case No. |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KADEN'S COMMONS, LLC AND JEREMY | ) | |
| WOLFF, | ) | |
| | ) | |
|     Defendants. | ) | |

## AFFIDAVIT PURSUANT TO SUPREME COURT RULE 222

Pursuant to Illinois Supreme Court Rule 222(B), counsel for the above-named Plaintiff certifies that Plaintiff seeks money damages in excess of $50,000.00, not including interest, costs, and attorneys' fees.

Respectfully Submitted,

By:    /s/Andrew H. Eres
        Attorney for Plaintiff

Andrew H. Eres (ILARDC 6237032)
Jeremy P. Kreger (ILARDC 6280403)
Briana Y. Hammons (ILARDC 6349199)
Ronald A. Damashek (IARDC 6183820)
Dickinson Wright PLLC
55 West Monroe, Suite 1200
Chicago, Illinois 60603
(312) 641-0060
aeres@dickinson-wright.com
jkreger@dickinson-wright.com
bhammons@dickinson-wright.com
rdamashek@dickinson-wright.com

4883-7934-8718 v3 [25535-672]

# EXHIBIT A



### U.S. Small Business Administration

# NOTE

| SBA Loan # | |
|---|---|
| SBA Loan Name | Kaden's Commons, LLC |
| Date | January 30, 2023 |
| Loan Amount | $504,400.00 |
| Interest Rate | Variable WSJP+2.750%, Adjusting Quarterly |
| Borrower | Kaden's Commons, LLC |
| Operating Company | |
| Lender | The Huntington National Bank |

1.  PROMISE TO PAY:

    In return for the Loan, Borrower promises to pay to the order of Lender the amount of

    Five Hundred Four Thousand Four Hundred and 00/100 _____ Dollars,

    interest on the unpaid principal balance, and all other amounts required by this Note.

2.  DEFINITIONS:

    "Collateral" means any property taken as security for payment of this Note or any guarantee of this Note.

    "Guarantor" means each person or entity that signs a guarantee of payment of this Note.

    "Loan" means the loan evidenced by this Note.

    "Loan Documents" means the documents related to this loan signed by Borrower, any Guarantor, or anyone who pledges collateral.

    "SBA" means the Small Business Administration, an Agency of the United States of America.

3.  PAYMENT TERMS:

    Borrower must make all payments at the place Lender designates. The payment terms for this Note are:

The interest rate on this Note will fluctuate. The initial interest rate is 10.25% per year. This initial rate is the Prime Rate in effect on the first business day of the month in which SBA received the loan application, plus 2.75%. The initial interest rate must remain in effect until the first change period begins unless changed in accordance with SOP 50 10.

Borrower must pay a total of 6 payments of interest only on the disbursed principal balance beginning two months from the month this Note is dated and every month thereafter; payments must be made on the fifth calendar day in the months they are due.

Borrower must pay principal and interest payments of $6,737.23 every month, beginning eight months from the month this Note is dated; payments must be made on the fifth calendar day in the months they are due.

Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

The interest rate will be adjusted every calendar quarter (the "change period") beginning April 1st, 2023 (date of first rate adjustment).

The "Prime Rate" is the Prime Rate in effect on the first business day of the month (as published in the Wall Street Journal newspaper) in which SBA received the application, or the first day of the month in which any interest rate change occurs. Base Rates will be rounded to two decimal places with .004 being rounded down and .005 being rounded up.

The adjusted interest rate will be 2.75% above the Prime Rate. Lender will adjust the interest rate on the first calendar day of each change period. The change in interest rate is effective on that day whether or not Lender gives Borrower notice of the change. The interest rate identified in the Note may not be changed during the life of the Loan unless changed in accordance with SOP 50 10.

The interest rate adjustment period may only be changed in accordance with SOP 50 10. Lender must adjust the payment amount at least annually as needed to amortize principal over the remaining term of the note.

If SBA purchases the guaranteed portion of the unpaid principal balance, the interest rate becomes fixed at the rate in effect at the time of the earliest uncured payment default. If there is no uncured payment default, the rate becomes fixed at the rate in effect at the time of purchase.

Loan Prepayment:
Notwithstanding any provision in this Note to the contrary: Borrower may prepay this Note. Borrower may prepay 20 percent or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20 percent and the Loan has been sold on the secondary market, Borrower must:
a. Give Lender written notice;
b. Pay all accrued interest; and
c. If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph b., above.

If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice. All remaining principal and accrued interest is due and payable 10 years and 6 months from date of Note.

Late Charge: If a payment on this Note is more than 10 days late, Lender may charge Borrower a late fee of up to 5.00% of the unpaid portion of the regularly scheduled payment.

4.   DEFAULT:

Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower or Operating Company:

A.   Fails to do anything required by this Note and other Loan Documents;
B.   Defaults on any other loan with Lender;
C.   Does not preserve, or account to Lender's satisfaction for, any of the Collateral or its proceeds;
D.   Does not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender or SBA;
E.   Makes, or anyone acting on their behalf makes, a materially false or misleading representation to Lender or SBA;
F.   Defaults on any loan or agreement with another creditor, if Lender believes the default may materially affect Borrower's ability to pay this Note;
G.   Fails to pay any taxes when due;
H.   Becomes the subject of a proceeding under any bankruptcy or insolvency law;
I.   Has a receiver or liquidator appointed for any part of their business or property;
J.   Makes an assignment for the benefit of creditors;
K.   Has any adverse change in financial condition or business operation that Lender believes may materially affect Borrower's ability to pay this Note;
L.   Reorganizes, merges, consolidates, or otherwise changes ownership or business structure without Lender's prior written consent; or
M.   Becomes the subject of a civil or criminal action that Lender believes may materially affect Borrower's ability to pay this Note.


5.   LENDER'S RIGHTS IF THERE IS A DEFAULT:

Without notice or demand and without giving up any of its rights, Lender may:

A.   Require immediate payment of all amounts owing under this Note;
B.   Collect all amounts owing from any Borrower or Guarantor;
C.   File suit and obtain judgment;
D.   Take possession of any Collateral; or
E.   Sell, lease, or otherwise dispose of, any Collateral at public or private sale, with or without advertisement.


6.   LENDER'S GENERAL POWERS:

Without notice and without Borrower's consent, Lender may:

A.   Bid on or buy the Collateral at its sale or the sale of another lienholder, at any price it chooses;
B.   Incur expenses to collect amounts due under this Note, enforce the terms of this Note or any other Loan Document, and preserve or dispose of the Collateral. Among other things, the expenses may include payments for property taxes, prior liens, insurance, appraisals, environmental remediation costs, and reasonable attorney's fees and costs. If Lender incurs such expenses, it may demand immediate repayment from Borrower or add the expenses to the principal balance;
C.   Release anyone obligated to pay this Note;
D.   Compromise, release, renew, extend or substitute any of the Collateral; and
E.   Take any action necessary to protect the Collateral or collect amounts owing on this Note.

7.  WHEN FEDERAL LAW APPLIES:

When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.

8.  SUCCESSORS AND ASSIGNS:

Under this Note, Borrower and Operating Company include the successors of each, and Lender includes its successors and assigns.

9.  GENERAL PROVISIONS:

A.  All individuals and entities signing this Note are jointly and severally liable.

B.  Borrower waives all suretyship defenses.

C.  Borrower must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

D.  Lender may exercise any of its rights separately or together, as many times and in any order it chooses. Lender may delay or forgo enforcing any of its rights without giving up any of them.

E.  Borrower may not use an oral statement of Lender or SBA to contradict or alter the written terms of this Note.

F.  If any part of this Note is unenforceable, all other parts remain in effect.

G.  To the extent allowed by law, Borrower waives all demands and notices in connection with this Note, including presentment, demand, protest, and notice of dishonor. Borrower also waives any defenses based upon any claim that Lender did not obtain any guarantee; did not obtain, perfect, or maintain a lien upon Collateral; impaired Collateral; or did not obtain the fair market value of Collateral at a sale.

10. STATE-SPECIFIC PROVISIONS:

IMPORTANT INFORMATION ABOUT PROCEDURES REQUIRED BY THE USA PATRIOT ACT

To help the government fight the funding of terrorism and money laundering activities. Federal Law requires all financial institutions to obtain, verify, and record information that identifies each entity or person who opens an account or establishes a relationship with the Lender.

What this means: When an entity or person opens an account or establishes a relationship with the Lender, the Lender may ask for the name, address, date of birth and other information that will allow the Lender to identify the entity or person who opens an account or establishes a relationship with the Lender. The Lender may also ask to see identify documents for the entity or person.

ILLINOIS INSURANCE NOTICE. Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in the collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by their agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on Borrower's own.

CONFESSION OF JUDGMENT. Borrower hereby irrevocably authorizes and empowers any attorney-at-law to appear in any court of record and to confess judgment against Borrower for the unpaid amount of this Note as evidenced by an affidavit signed by an officer of Lender setting forth the amount then due, attorneys' fees plus costs of suit, and to release all errors, and waive all rights of appeal. If a copy of this Note, verified by an affidavit, shall have been filed in the proceeding, it will not be necessary to file the original as a warrant of attorney. Borrower waives the right to any stay of execution and the benefit of all exemption laws now or hereafter in effect. No single exercise of the foregoing warrant and power to confess judgment will be deemed to exhaust the power, whether or not any such exercise shall be held by any court to be invalid, voidable, or void; but the power will continue undiminished and may be exercised from time to time as Lender may elect until all amounts owing on this Note have been paid in full. Borrower hereby waives and releases any and all claims or causes of action which Borrower might have against any attorney acting under the terms of authority which Borrower has granted herein arising out of or connected with the confession of judgment hereunder.

Multiple Advances:

This Note evidences a straight line of credit. Once the total amount of principal has been advanced, Borrower is not entitled to further loan advances. Advances under this Note may be requested either orally or in writing by Borrower or by an authorized person. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. Borrowers agrees to be liable for all sums either: (a) advanced in accordance with the instructions of an authorized person or (b) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs. Lender will have no obligation to advance funds under this Note if: (a) Borrower or any guarantor is in default under the terms of this Note or any agreement that borrower or any guarantor has with Lender, including any agreement made in connection with the signing of this Note; (b) Borrower or any guarantor ceases doing business or is insolvent; (c) any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of this Note or any other loan with Lender; (d) Borrower has applied funds provided pursuant to this Note for purpose other than those authorized by Lender; or (e) Lender in good faith deems itself insecure under this Note or any other agreement between Lender and Borrower.

Draw Period:

The proceeds of the loan evidenced hereby may be advanced in partial amounts during the term hereof and prior to maturity, and no partial advance shall be made after August 5, 2023.

11. BORROWER'S NAME(S) AND SIGNATURE(S):

By signing below, each individual or entity becomes obligated under this Note as Borrower.

Kaden's Commons, LLC

_Jeremy Wolf_       January 30, 2023
Jeremy Wolf
Member

GROUP EXHIBIT B

## PROMISSORY NOTE MODIFICATION AGREEMENT

This Promissory Note Modification Agreement ("Agreement") is entered into on _____August 18th_____, 20_23_, by and between THE HUNTINGTON NATIONAL BANK ("Lender") and Kaden's Commons LLC ("Borrower", whether one or more).

WHEREAS, Borrower executed and delivered to Lender a certain Small Business Administration Note in the original principal amount of $504,400.00 dated January 30, 2023 (as the same may have been modified from time to time, the "Note"); and

WHEREAS, Borrower has requested and Lender has agreed to extend the draw period of the Note.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower and Lender, for themselves, their successors and assigns, hereby agree as follows:

1. The background recitals set forth above are true and correct statements of fact, and are hereby incorporated and made a part hereof.

2. The following changes are hereby made to the Note:

    A. The fifth and sixth sentences of Section 3 are hereby amended to read: Borrower must pay a total of 12 payments of interest only on the disbursed principal beginning two month(s) from the month this Note is dated and every month thereafter; payments must be made on the fifth calendar day in the months they are due. Borrower must pay principal and interest payments of $6,737.23 every month, beginning fourteen months from the month this Note is dated; payments must be made on the fifth calendar day in the months they are due.

    B. The reference to August 5, 2023 in the "Draw Period" paragraph in Section 10 is hereby amended to February 5, 2024.

3. Borrower hereby declares that it has no defenses, setoffs, or claims of any kind against Lender that relate in any way to the Note, or any amounts due thereunder, or any loan documents.

4. All terms and conditions of the Note not specifically amended herein are hereby confirmed and ratified and shall remain in full force and effect in all respects. Lender executes this Agreement to evidence its consent to the modifications effected hereby; provided, however, such consent shall neither be nor be deemed to be a consent to, or waiver of, the necessity of the consent of Lender to any future modification. This Agreement does not constitute a discharge or novation of the Note or any other documents executed in connection with the Note, as modified, including any security documents, and such documents shall continue in full force and effect and shall be fully binding upon the parties hereto. This Agreement shall be governed by and construed according to the law of the State of Illinois, except its conflicts of law provisions.

[SIGNATURES ON THE FOLLOWING PAGE]

Internal Use

IN WITNESS WHEREOF, Borrower and Lender have executed the foregoing Promissory Note Modification Agreement as of the date first written above.

Kaden's Commons LLC

By: _Jeremy Wolff 8/18/23_____

Name: _Jeremy Wolff_____

Title: _Member_____

The Huntington National Bank

By: _____

Name: _____Luis Alvarez_____

Title: _Business Client Manager_____

## PROMISSORY NOTE MODIFICATION AGREEMENT

This Promissory Note Modification Agreement ("Agreement") is entered into on ___1/11/24___, 2024, by and between THE HUNTINGTON NATIONAL BANK ("Lender") and Kaden's Commons, LLC ("Borrower", whether one or more).

WHEREAS, Borrower executed and delivered to Lender a certain Small Business Administration Note in the original principal amount of $504,400.00 dated January 30, 2023 (as the same may have been modified from time to time, the "Note"); and

WHEREAS, Borrower has requested and Lender has agreed to increase the principal amount of the Note.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower and Lender, for themselves, their successors and assigns, hereby agree as follows:

1. The background recitals set forth above are true and correct statements of fact, and are hereby incorporated and made a part hereof.

2. The following changes are hereby made to the Note:

A. The "Loan Amount" is hereby increased to $629,500.00.

B. Section 1 is hereby amended and restated as follows:

    1. PROMISE TO PAY:

    In return for the Loan, Borrower promises to pay to the order of Lender the amount of Six Hundred Twenty Nine Thousand Five Hundred and 00/100 Dollars, interest on the unpaid principal balance, and all other amounts required by this Note.

C. The sixth sentence of Section 3 is hereby amended to read:

    Borrower must pay principal and interest payments of $6,737.23 every month, beginning eight months from the month this Note is dated; payments must be made on the fifth calendar day in the months they are due.

3. Borrower hereby declares that it has no defenses, setoffs, or claims of any kind against Lender that relate in any way to the Note, or any amounts due thereunder, or any loan documents.

4. All terms and conditions of the Note not specifically amended herein are hereby confirmed and ratified and shall remain in full force and effect in all respects. Lender executes this Agreement to evidence its consent to the modifications effected hereby; provided, however, such consent shall neither be nor be deemed to be a consent to, or waiver of, the necessity of the consent of Lender to any future modification. This Agreement does not constitute a discharge or novation of the Note or any other documents executed in connection with the Note, as modified, including any security documents, and such documents shall continue in full force and effect and shall be fully binding upon the parties hereto. This Agreement shall be governed by and construed according to the law of the State of Illinois, except its conflicts of law provisions.

[SIGNATURES ON THE FOLLOWING PAGE]

Page 1 of 2

IN WITNESS WHEREOF, Borrower and Lender have executed the foregoing Promissory Note Modification Agreement as of the date first written above.

B&C Reeder Holdings LLC

By: _____

Name: Jeremy Wolff

Title:  Member

The Huntington National Bank

By: _____

Name: Ejaz Syed

Title:   SBA Product Specialist

Page 2 of 2

Internal Use

# EXHIBIT C



U.S. Small Business Administration

## UNCONDITIONAL GUARANTEE

| SBA Loan # | ▉▉▉▉▉▉▉ |
|---|---|
| SBA Loan Name | Kaden's Commons, LLC |
| Guarantor | Jeremy Wolff |
| Borrower | Kaden's Commons, LLC |
| Lender | Huntington National Bank |
| Date | January 30, 2023 |
| Note Amount | $504,400.00 |

1.  GUARANTEE:

    Guarantor unconditionally guarantees payment to Lender of all amounts owing under the Note. This Guarantee remains in effect until the Note is paid in full. Guarantor must pay all amounts due under the Note when Lender makes written demand upon Guarantor. Lender is not required to seek payment from any other source before demanding payment from Guarantor.

2.  NOTE:

    The "Note" is the promissory note dated _____ January 30, 2023 _____ in the principal amount of _____ Five Hundred Four Thousand Four Hundred and 00/100 _____ Dollars, from Borrower to Lender. It includes any assumption, renewal, substitution, or replacement of the Note, and multiple notes under a line of credit.

3.  DEFINITIONS:

    "Collateral" means any property taken as security for payment of the Note or any guarantee of the Note.

    "Loan" means the loan evidenced by the Note.

    "Loan Documents" means the documents related to the Loan signed by Borrower, Guarantor or any other guarantor, or anyone who pledges Collateral.

    "SBA" means the Small Business Administration, an Agency of the United States of America.

4.  LENDER'S GENERAL POWERS:

Lender may take any of the following actions at any time, without notice, without Guarantor's consent, and without making demand upon Guarantor:

A.  Modify the terms of the Note or any other Loan Document except to increase the amounts due under the Note;

B.  Refrain from taking any action on the Note, the Collateral, or any guarantee;

C.  Release any Borrower or any guarantor of the Note;

D.  Compromise or settle with the Borrower or any guarantor of the Note;

E.  Substitute or release any of the Collateral, whether or not Lender receives anything in return;

F.  Foreclose upon or otherwise obtain, and dispose of, any Collateral at public or private sale, with or without advertisement;

G.  Bid or buy at any sale of Collateral by Lender or any other lienholder, at any price Lender chooses; and

H.  Exercise any rights it has, including those in the Note and other Loan Documents.

These actions will not release or reduce the obligations of Guarantor or create any rights or claims against Lender.

5.  FEDERAL LAW:

When SBA is the holder, the Note and this Guarantee will be construed and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Guarantee, Guarantor may not claim or assert any local or state law against SBA to deny any obligation, defeat any claim of SBA, or preempt federal law.

6.  RIGHTS, NOTICES, AND DEFENSES THAT GUARANTOR WAIVES:

To the extent permitted by law,

A.  Guarantor waives all rights to:
    1)  Require presentment, protest, or demand upon Borrower;
    2)  Redeem any Collateral before or after Lender disposes of it;
    3)  Have any disposition of Collateral advertised; and
    4)  Require a valuation of Collateral before or after Lender disposes of it.

B.  Guarantor waives any notice of:
    1)  Any default under the Note;
    2)  Presentment, dishonor, protest, or demand;
    3)  Execution of the Note;
    4)  Any action or inaction on the Note or Collateral, such as disbursements, payment, nonpayment, acceleration, intent to accelerate, assignment, collection activity, and incurring enforcement expenses;
    5)  Any change in the financial condition or business operations of Borrower or any guarantor;
    6)  Any changes in the terms of the Note or other Loan Documents, except increases in the amounts due under the Note; and
    7)  The time or place of any sale or other disposition of Collateral.

C.  Guarantor waives defenses based upon any claim that:
    1)  Lender failed to obtain any guarantee;
    2)  Lender failed to obtain, perfect, or maintain a security interest in any property offered or taken as Collateral;
    3)  Lender or others improperly valued or inspected the Collateral;
    4)  The Collateral changed in value, or was neglected, lost, destroyed, or underinsured;

5) Lender impaired the Collateral;
6) Lender did not dispose of any of the Collateral;
7) Lender did not conduct a commercially reasonable sale;
8) Lender did not obtain the fair market value of the Collateral;
9) Lender did not make or perfect a claim upon the death or disability of Borrower or any guarantor of the Note;
10) The financial condition of Borrower or any guarantor was overstated or has adversely changed;
11) Lender made errors or omissions in Loan Documents or administration of the Loan;
12) Lender did not seek payment from the Borrower, any other guarantors, or any Collateral before demanding payment from Guarantor:
13) Lender impaired Guarantor's suretyship rights;
14) Lender modified the Note terms, other than to increase amounts due under the Note. If Lender modifies the Note to increase the amounts due under the Note without Guarantor's consent, Guarantor will not be liable for the increased amounts and related interest and expenses, but remains liable for all other amounts;
15) Borrower has avoided liability on the Note; or
16) Lender has taken an action allowed under the Note, this Guarantee, or other Loan Documents.

7.   DUTIES AS TO COLLATERAL:

Guarantor will preserve the Collateral pledged by Guarantor to secure this Guarantee. Lender has no duty to preserve or dispose of any Collateral.

8.   SUCCESSORS AND ASSIGNS:

Under this Guarantee, Guarantor includes heirs and successors, and Lender includes its successors and assigns.

9.   GENERAL PROVISIONS:

A.   ENFORCEMENT EXPENSES. Guarantor promises to pay all expenses Lender incurs to enforce this Guarantee, including, but not limited to, attorney's fees and costs.

B.   SBA NOT A CO-GUARANTOR. Guarantor's liability will continue even if SBA pays Lender. SBA is not a co-guarantor with Guarantor. Guarantor has no right of contribution from SBA.

C.   SUBROGATION RIGHTS. Guarantor has no subrogation rights as to the Note or the Collateral until the Note is paid in full.

D.   JOINT AND SEVERAL LIABILITY. All individuals and entities signing as Guarantor are jointly and severally liable.

E.   DOCUMENT SIGNING. Guarantor must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

F.   FINANCIAL STATEMENTS. Guarantor must give Lender financial statements as Lender requires.

G.   LENDER'S RIGHTS CUMULATIVE, NOT WAIVED. Lender may exercise any of its rights separately or together, as many times as it chooses. Lender may delay or forgo enforcing any of its rights without losing or impairing any of them.

H.   ORAL STATEMENTS NOT BINDING. Guarantor may not use an oral statement to contradict or alter the written terms of the Note or this Guarantee, or to raise a defense to this Guarantee.

I.   SEVERABILITY. If any part of this Guarantee is found to be unenforceable, all other parts will remain in effect.

J.   CONSIDERATION. The consideration for this Guarantee is the Loan or any accommodation by Lender as to the Loan.

10. STATE-SPECIFIC PROVISIONS:

IMPORTANT INFORMATION ABOUT PROCEDURES REQUIRED BY THE USA PATRIOT ACT

To help the government fight the funding of terrorism and money laundering activities. Federal Law requires all financial institutions to obtain, verify, and record information that identifies each entity or person who opens an account or establishes a relationship with the Lender.

What this means: When an entity or person opens an account or establishes a relationship with the Lender, the Lender may ask for the name, address, date of birth and other information that will allow the Lender to identify the entity or person who opens an account or establishes a relationship with the Lender. The Lender may also ask to see identify documents for the entity or person.

CONFESSION OF JUDGMENT. Guarantor hereby irrevocably authorizes and empowers any attorney-at-law to appear in any court of record and to confess judgment against Guarantor for the unpaid amount of this Note as evidenced by an affidavit signed by an officer of Lender setting forth the amount then due, attorneys' fees plus costs of suit, and to release all errors, and waive all rights of appeal. If a copy of this Note, verified by an affidavit, shall have been filed in the proceeding, it will not be necessary to file the original as a warrant of attorney. Guarantor waives the right to any stay of execution and the benefit of all exemption laws now or hereafter in effect. No single exercise of the foregoing warrant and power to confess judgment will be deemed to exhaust the power, whether or not any such exercise shall be held by any court to be invalid, voidable, or void; but the power will continue undiminished and may be exercised from time to time as Lender may elect until all amounts owing on this Note have been paid in full. Guarantor hereby waives and releases any and all claims or causes of action which Guarantor might have against any attorney acting under the terms of authority which Guarantor has granted herein arising out of or connected with the confession of judgment hereunder.

11.  GUARANTOR ACKNOWLEDGMENT OF TERMS.

Guarantor acknowledges that Guarantor has read and understands the significance of all terms of the Note and this Guarantee, including all waivers.

12.  GUARANTOR NAME(S) AND SIGNATURE(S):

By signing below, each individual or entity becomes obligated as Guarantor under this Guarantee.

Jeremy Wolff                    January 30, 2023
Individually



# EXHIBIT D

## COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $504,400.00 | 01-30-2023 | 07-30-2033 | ▮▮▮▮▮ | | | | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Grantor:** KADEN'S COMMONS, LLC
3505-3509 W Belmont Ave #63
Chicago, IL 60618

**Lender:** THE HUNTINGTON NATIONAL BANK
Chicago Commercial Lending
501 West North Avenue
Melrose Park, IL 60160

THIS COMMERCIAL SECURITY AGREEMENT dated January 30, 2023, is made and executed between KADEN'S COMMONS, LLC ("Grantor") and THE HUNTINGTON NATIONAL BANK ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

All inventory, equipment, accounts (including but not limited to all health-care-insurance receivables), chattel paper, instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); all oil, gas and other minerals before extraction; all oil, gas, other minerals and accounts constituting as-extracted collateral; all fixtures; all timber to be cut; all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all good will relating to the foregoing property; all records and data and embedded software relating to the foregoing property, and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property.

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A) All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

**CROSS-COLLATERALIZATION.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

**Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. **This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.**

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management or in the members or managers of the limited liability company Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its membership agreement does not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Lender, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Accounts. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.



# COMMERCIAL SECURITY AGREEMENT
## (Continued)

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, including the sales of inventory, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of Illinois, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least twenty (20) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement. Grantor will promptly notify Lender of any change to Grantor's name or the name of any individual Grantor, any individual who is a partner



## COMMERCIAL SECURITY AGREEMENT
### (Continued)

for a Grantor, and any individual who is a trustee or settlor or trustor for a Grantor under this Agreement. Grantor will also promptly notify Lender of any change to the name that appears on the most recently issued, unexpired driver's license or state-issued identification card, any expiration of the most recently issued driver's license or state-issued identification card for Grantor or any individual for whom Grantor is required to provide notice regarding name changes.

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until default and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Until otherwise notified by Lender, Grantor may collect any of the Collateral consisting of accounts. At any time and even though no Event of Default exists, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for application to the Indebtedness. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon the occurrence of any Event of Default.

**REINSTATEMENT OF SECURITY INTEREST.** If payment is made by Grantor, whether voluntarily or otherwise, or by guarantor or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment (A) to Grantor's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, (B) by reason of any judgment, decree or order of any court or administrative body having jurisdiction over Lender or any of Lender's property, or (C) by reason of any settlement or compromise of any claim made by Lender with any claimant (including without limitation Grantor), the Indebtedness shall be considered unpaid for the purpose of enforcement of this Agreement and this Agreement shall continue to be effective or shall be reinstated, as the case may be, notwithstanding any cancellation of this Agreement or of any note or other instrument or agreement evidencing the Indebtedness and the Collateral will continue to secure the amount repaid or recovered to the same extent as if that amount never had been originally received by Lender, and Grantor shall be bound by any judgment, decree, order, settlement or compromise relating to the Indebtedness or to this Agreement.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default in Favor of Third Parties.** Any guarantor or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of any guarantor's or Grantor's property or ability to perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution of Grantor (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Grantor's existence as a going business or the death of any member, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Illinois Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Mortgagee in Possession.** Lender shall have the right to be placed as mortgagee in possession or to have a receiver appointed to take



# COMMERCIAL SECURITY AGREEMENT
## (Continued)

Page 4

possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the Rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The mortgagee in possession or receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**INTERPRETATION.** If there is more than one Grantor, each reference in this Agreement to "Grantor" shall apply to each Grantor separately as well as to all of them jointly, and the obligations, covenants, promises, warranties and representations of Grantor shall be joint and several.

**APPLICABLE LAW. The loan secured by this lien was made under a United States Small Business Administration (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this document, then under SBA regulations: a) When SBA is the holder of the Note, this document and all documents evidencing or securing the loan will be construed in accordance with federal law. b) Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability. No Borrower or Grantor may claim or assert against SBA any local or state law to deny any obligation of Borrower or Grantor, or defeat any claim of SBA with respect to the loan. Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument.**

**COUNTERPARTS.** This document may be executed by the parties hereto in any number of separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Illinois without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Illinois.**

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time



# COMMERCIAL SECURITY AGREEMENT
## (Continued)

Page 5

as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury.** All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means KADEN'S COMMONS, LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means KADEN'S COMMONS, LLC.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

**Lender.** The word "Lender" means THE HUNTINGTON NATIONAL BANK, its successors and assigns.

**Note.** The word "Note" means the Note dated January 30, 2023 and executed by KADEN'S COMMONS, LLC in the principal amount of $504,400.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED JANUARY 30, 2023.

GRANTOR:

KADEN'S COMMONS, LLC

By: _____ V 30/23

Jeremy Wolff, Member of KADEN'S COMMONS, LLC

LaserPro, Ver. 22.3.0.035 Copr. Finastra USA Corporation 1997, 2023   All Rights Reserved.   - IL  C:\LaserPro_Prod\CFI\LPL\E40.FC  TR-410771  PR-COMMSBA



# EXHIBIT E

*Exhibit 4: Asset Listing*

| Ref # | Qty | Description | Make | Year | Model | Serial/VIN | Hours/Miles and Condition | FLV | OLV | FMV |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 3505-3509 W. Belmont Avenue, #63, Chicago, IL 60618 | | | | | |
| 1 | 1 | HVAC FORCED AIR FURNACE AND AIR CONDITIONING UNIT, LOCATED ON THE ROOF | YORK | 2023 | | | GOOD/LEASEHOLD IMPROVEMENT | 2,750 | 4,000 | 6,500 |
| 2 | 2 | HVAC FORCED AIR FURNACE AND AIR CONDITIONING UNIT, 125000 BTU, 5 TON, LOCATED ON THE ROOF | YORK | 2023 | | | GOOD/LEASEHOLD IMPROVEMENT | 5,500 | 8,000 | 13,000 |
| 3 | 3 | HVAC FORCED AIR FURNACE AND AIR CONDITIONING UNIT, 125000 BTU, 5 TON, LOCATED ON THE ROOF | YORK | 2023 | | | GOOD/LEASEHOLD IMPROVEMENT | 8,250 | 12,000 | 19,500 |
| 4 | 1 | SS REACH-IN REFRIGERATOR, 1 DOOR | TRUE | | | | FAIR | 425 | 500 | 950 |
| 5 | 1 | SS REACH-IN FREEZER, 1 DOOR | TRUE | 2016 | | | FAIR | 450 | 550 | 975 |
| 6 | 1 | SS 2-DOOR PREP COOLER | TRUE | 2013 | | | FAIR | 425 | 550 | 1,050 |
| 7 | 2 | SS HAND WASH SINK | REGENCY | | | | FAIR | 60 | 80 | 150 |
| 8 | 1 | SS 3 BASIN WASH SINK W/ FAUCET ATTACHMENTS | ADVANCE TABCO | | | | GOOD | 365 | 465 | 750 |
| 9 | 1 | SS DISHWASHER | AUTO-CHLOR | | | | FAIR | 1,250 | 1,500 | 2,500 |
| 10 | 1 | ICE MAKER W/ BIN | MANITOWAC | 2023 | | | GOOD | 1,000 | 1,175 | 2,250 |
| 11 | 1 | COFFEE GRINDER | ANFIM | 2022 | | | FAIR | 250 | 350 | 650 |
| 12 | 1 | COFFEE GRINDER | GRINDMASTER | | | | FAIR | 225 | 325 | 465 |
| 13 | 1 | AUTOMATIC COFFEE BREWER | BUNN | | | | GOOD | 775 | 1,000 | 1,400 |
| 14 | 1 | COMMERCIAL BLENDER, 2200 WATT | WANT JOIN | | | | FAIR | 75 | 100 | 150 |
| 15 | 1 | 1 DOOR UNDER COUNTER SS COOLER | BEVERAGE AIR | | | | FAIR | 350 | 450 | 950 |
| 16 | 1 | RAPID COOK HIGH SPEED CONVECTION OVEN MICROWAVE | TURBO CHEF | 2018 | | | FAIR | 750 | 850 | 1,450 |
| 17 | 1 | COFFEE GRINDER | ANFIM | 2022 | | | FAIR | 350 | 475 | 750 |
| 18 | 1 | COMMERCIAL BLENDER, 2200 WATT | | | | | GOOD | 75 | 100 | 175 |
| 19 | 1 | OPEN CHEST DISPLAY COOLER W/ UPPER DISPLAY W/ REAR SLIDE DOORS | TURBO-AIR | 2016 | | | FAIR | 1,550 | 1,750 | 3,850 |
| 20 | 1 | 1-DOOR UNDER COUNTER COOLER | BEVERAGE-AIR | | | | FAIR | 450 | 525 | 1,000 |
| 21 | 1 | ESPRESSO COFFEE TAMPER | BARRISTA TECHNOLOGY BV | 2023 | | | FAIR | 250 | 325 | 535 |
| 22 | 1 | 2 GROUP ESPRESSO MACHINE, VOLUMETRIC CONTROL | NUOVO SIMONELLI | | | | GOOD | 4,500 | 5,000 | 8,000 |
| 23 | LOT | CAFE SUPPORT EQUIPMENT TO INCLUDE: CABINET AND COUNTERTOP SECTIONS (1) W/ SS SINK INSERT, NAPKIN DISPENSERS, WIRE SHELVING, TOWEL DISPENSER, WIRE RACKING , COFFEE URN, ROLLING PODIUM, GARBAGE CANS, (5) UNOPENED IKEA FLOATING SHELVES, UNDER COUNTER R/O 5 STAGE WATER FILTER, (4) UNINSTALLED U-STYLE COMMERCIAL BIKE RACK SECTIONS | | | | | | 535 | 700 | 1,275 |
| 24 | 1 | 3 LEVEL PADDED PLAY STRUCTURE W/ PERIMETER FLOOR MATS, INTERIOR SLIDES, PADS, PADDED STAIRS ,RAMPS ETC, APPROXIMATELY 28' X 24' X 18' TALL | | | | | GOOD | 7,500 | 12,500 | 25,000 |
| 25 | LOT | FURNITURE TO INCLUDE: APPROXIMATELY 20 WHITE 4' TABLES, 80 WHITE CHAIRS, FOLDING CHAIRS, (2) ULINE WORK TABLES, (4) HIGH CHAIRS | | | | | | 915 | 1,115 | 1,550 |



| Ref # | Qty | Description | Make | Year | Model | Serial/VIN | Hours/Miles and Condition | FLV | OLV | FMV |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 3505-3509 W. Belmont Avenue, #63, Chicago, IL 60618 | | | | | |
| 26 | LOT | POS EQUIPMENT TO INCLUDE: SQUARE POS TERMINAL, CASH DRAWER, HANDHELD SCANNER, STAR RECEIPT PRINTER, (2) KEYBOARDS, (2) MICE, (2) BENQ MONITORS, (2) BEELINK MINI 8 | | | | | | 335 | 435 | 800 |
| 27 | 1 | WOOD CAFE PLAY STRUCTURE | | | | | GOOD | 775 | 855 | 1,450 |
| 28 | 1 | SOLID WOOD PLAY STRUCTURE W/ STAIRS AND A SLIDE | CEDAR WORKS COMMERCIAL | | | | GOOD | | 900 | 1,750 |
| 29 | 1 | SOLID WOOD PLAY STRUCTURE W/ STAIRS, A SLIDE, A RAMP, PULLEY W/ BUCKET | CEDAR WORKS COMMERCIAL | | | | GOOD | 1,500 | 2,000 | 4,250 |
| 30 | 1 | FLAT SCREEN TELEVISION 55" | TOSHIBA | 2023 | ▮▮▮ | ▮▮▮ | FAIR | 75 | 85 | 135 |
| 31 | 2 | SOLID WOOD WALDORF IMAGINATIVE PLAY ARCH | | | | | GOOD | 200 | 350 | 850 |
| 32 | LOT | COUCHES AND LOUNGE CHAIRS AND OFFICE FURNITURE TO INCLUDE: TO INCLUDE: (2) UNOPENED, WRAPPED AREA RUGS (5) COUCHES, (3) LOUNGE CHAIRS, END TABLES, COFFEE TABLE, DESK, OFFICE CHAIRS, BOOKSHELVES, WHITE BOARD, TABLE | | | | | | 1,375 | 1,485 | 2,345 |
| 33 | LOT | ELECTRONICS TO INCLUDE: KEURIG COFFEE MAKER, SHARK VACUUM, HP OFFICEJET PRO 8025E, YEALINK PHONES, DIGITAL SCALE, APPROXIMATELY (10) LOREX CAMERA AND DVR SYSTEM, PORTABLE RADIO, (2) ELKAY DRINKING FOUNTAINS | | | | | | 355 | 455 | 655 |
| 34 | LOT | ADDITIONAL FURNITURE AND MISC ITEMS TO INCLUDE: (7) SOLID WOOD BOOKSHELVES, (3) CUBBIES, (2) UNOPENED CITY HEROES SENSORY EDGE, (7) SECTION LAKESHORE PARTITIONS, (2) LAKESHORE SAFETY GATES, OPENED AND UNOPENED PUZZLE PIECE FLOOR TILES, UNOPENED CHILDS SHOPPING CART BOX, (3) ROLLING METAL CARTS W/ MULTI-COLORED TRAYS, (2) 2-DOOR CABINETS, ROUND WOOD TABLE, (2) ROLLING FLAT CARTS, KOHLER TOILET TANK, PLASTIC STORAGE BINS, CAUTION CONES | | | | | | 1,350 | 1,450 | 2,275 |
| 35 | LOT | CHILDRENS TOYS TO INCLUDE: (2) LITTLE TIKES BUGGIES, (2) BIG WHEELS, (3) HANDLE SKATEBOARDS, WOOD BALANCE BEAM SECTIONS, LARGE QUANTITY OF MISC. LOOSE LEGO PIECES, DOLLS, TOY FIGURES ETC | | | | | | 685 | 785 | 1,285 |
| | | | | | | | **TOTAL** | **45,675** | **63,185** | **110,620** |

# EXHIBIT F

██████████

██████████

██████████

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

RECEIVED

IL SECRETARY OF STATE

UNIFORM COMMERCIAL CODE

20230203    1341

$20.00    Electronic

**29294585**                    **FS**

| A. NAME & PHONE OF CONTACT AT FILER (optional) | |
|---|---|
| Wolters Kluwer Lien Solutions | 800-331-3282 |

B. E-MAIL CONTACT AT FILER (optional)
uccfilingreturn@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

⌐ LIEN SOLUTIONS
P.O. Box 29071
Glendale, CA  91209-9071
USA ⌐

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME:  Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| KADEN'S COMMONS, LLC | | | | |

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3505-3509 W BELMONT AVE #63 | CHICAGO | IL | 60618 | USA |

2. DEBTOR'S NAME:  Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):  Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| THE HUNTINGTON NATIONAL BANK | | | | |

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 5555 CLEVELAND AVE - GW1W37 | COLUMBUS | OH | 43231 | USA |

4. COLLATERAL:  This financing statement covers the following collateral:

All inventory, equipment, accounts (including but not limited to all health-care-insurance receivables), chattel paper, instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); all oil, gas and other minerals before extraction; all oil, gas, other minerals and accounts constituting as-extracted collateral; all fixtures; all timber to be cut; all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all good will relating to the foregoing property; all records and data and embedded software relating to the foregoing property, and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
IL-0-91206357-65848740

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)